Case No. 25-3311 Oakland County Employees Retirement System et al. v. Sotera Health Company et al. Arguments not to exceed 15 minutes per side. Mr. Harrod, you may proceed for the appellate. Good morning. Good morning, Your Honors. James Harrod from Bernstein-Lewis Berger & Grossman for the plaintiff's appellants. I've reserved four minutes for rebuttal. All right. May it please the court. The district court's decision dismissing plaintiff's claims should be reversed. Defendant Sotera has operated medical sterilization facilities for decades that use ethylene oxide, which I'll refer to as ETO or EO. ETO is a carcinogenic gas. Can you speak up just a little bit, please? I'm sorry, Your Honor. I sure can. Operations of these facilities created both business and liability risks that defendants sought to minimize. In a November 2020 initial public offering, the defendants in this case sold over $1 billion in common stock. In the nearly two years that followed, the defendants told investors that Sotera's ETO operations had been safe and had, quote, exceeded any of the expectations from the regulators for the history of our company, close quote. They also said that Sterigenics has a history of enhancing work practices and emission controls with the aim of reducing EO emissions. But in contrast to these and similar statements about the safety of its historical operations, Sotera had actually operated its ETO facilities unsafely, without regard to the surrounding communities, while making efforts to suppress the regulation of ETO and in violation of permits and regulations. This behavior exposed people living nearby to cancer, resulting in numerous lawsuits, and thus exposed Sotera to significant business risk and liability. Investors were focused on these risks from Sotera's historical operations and the related injury lawsuits. These issues came up frequently in their conversations during public conferences with investors. The statements defendants made to investors about Sotera's purportedly safe ETO operations were in service of creating a false impression of their prior conduct and to minimize perception of the company's liability now as a public company. The truth concerning that historical conduct became known when reporting on the outcome of the first personal injury trial that was conducted against Sotera, which we refer to as the Commuta trial. That trial revealed that the evidence presented to the jury detailed how Sotera had operated with a wanton disregard for safety. And media reports following the outcome of that verdict said that during the trial, quote, emails and corporate documents highlighted on a courtroom screen showed the companies knew, that's referring to Sotera and its predecessors, knew long ago that ethylene oxide is extremely dangerous, close quote. The report went on to state that these internal documents showed that, quote, Sotera delayed installing pollution control equipment and attempted to undermine federal regulations that would require costly improvements at sterilization facilities. But the statements didn't directly relate to the dangerous substance that we're concerned with. So how do you, what's your argument as to why the statements that were made were other than, well, as to whether those statements were material rather than just puffery, so to speak? Okay. So I think it's a core question in this case because I understand as the defendants frame it, they're saying that we sued them because they lost a trial and the district court found that we were basically suing them for failing to predict the outcome of that. That's not what our case is about. Our case is about the fact that at the time the company goes public in 2020, starting in 2018, a mass of lawsuits had been brought against Sotera related to this historical liability. And the investors in the company were focused on that historical conduct as it related to the injury plaintiff's claims. So if you're an analyst and you're covering Sotera's stock after 2020, what you're trying to assess is, these people have sued this company for giving them cancer, and how do I assess the valuation impact of that? And so Sotera voluntarily, these are not required disclosures, makes statements like the ones I read and the other ones that are detailed in our papers. Those statements are directed at saying our historical conduct was compliant. We cared about the safety of the people who lived in the communities near our facilities. The evidence that was presented at that trial, which is in the record in our complaint, shows the opposite of that. It shows that the company was indifferent to the safety of the people in the communities. And the reason why that's important to the investors is because if you buy Sotera stock in 2020 or 2021 or 2022, you're trying to assess what is the value impact of this potential liability on my investment in this company. After the verdict came out and after this information that I just read to the market about what Sotera's historical conduct had been, the shares fell by 50 percent in the three days following the verdict. Well, let me ask you this. In terms of historical background, how is your argument undercut by the fact that there actually was only one, only a single period of noncompliance, and that was about 20 years ago from 2000 to 2004? Right. We acknowledge that. I think the way that I would put that is, first of all, I think there are two regulatory or permit violations in place. The first one begins when the facility in Illinois that was at the core of this trial in Chicago, in Cook County, the commuter trial, was concerning the Willowbrook facility. When they got the first permit, they said to the regulator, we'll do testing for the next two years. They didn't do any testing. So the permit was contingent upon them doing testing, but they never did. The second permit violation starts in 2000 to 2004. At that facility, they were supposed to have filters or emission control equipment on what's called the back vents in the room where they conduct the sterilization process where the ETO is used. They didn't have those. That was required by the permit from 2000 to 2004. So there's those two permit violations. But I would say that the kind of statements that they made, we allege and believe that those compliance statements were untrue and incorrect based on that record. And I'm going to circle back to one point about the timing of that that I think is important. The second point is they may also make statements, as I read, about implementing leading safety practices to further perform better than regulatory requirements. So they're putting out into the market that their behavior was broadly consistent with caring about the communities. That's not what the record evidence was in the trial and in their own documents. And, Judge, the reason why that's important is because what's happening in these injury trials is people are exposed to this gas over long periods of time. They develop cancer. It's a hard causation case in the injury cases because it's hard to prove that any one thing caused your cancer. But that liability existed in the aggregate against these companies for the years and years of their conduct. What they found was that the disregard for safety of the human beings living around these was wanton. They hit them with a large punitive damage award. And the information that's reported after the trial reflects that wanton disregard. It reflects disconnection of back meds. It reflects internal documents knowing that ETO causes risk to what they refer to as human receptors. Those are the people who live near their facilities. So the jury hears this. The company knows these records. They're their own documents. Defendant Hoffman, who's the chief global health and environmental safety officer for the company who reports directly to the CEO, is involved in the 2000 and 2004 decisions about the back fence at the Willowbrook facility. They're intimately familiar with this. Do you allege that the ‑‑ I mean, did they ever say our facilities don't cause cancer? There is a statement where the CEO said our facilities didn't cause this cancer. But I think the ‑‑ Who said that to what audience? To the investors. To the investors. The investors are very focused on this. And there's a couple of quotes in our complaint where an analyst, this is, I can give you the records of it, it's paragraph 299 of the complaint. In an investor conference, the analyst says to the CEO, another area we spend a lot of time speaking with investors about, and that's what's going on in Illinois. So was your client among that group of investors to whom that was said? They were ‑‑ it was in the market. Our investors, our clients purchased the stock based on the overall statements that were made in the market. There's a presumption of reliance here based on, you know, the efficient market hypothesis. So, you know, we're not, I think, you know, saying that our clients have relied, but they did rely on those statements and they infected the price of the stock. You know, counsel, it strikes me the statements that have been identified, I think we could all agree are lawyerly, and whether that's laudatory or derogatory, I guess it's in the eye of the beholder. It does, but we have this heightened pleading standard. You guys, I think, dispute, is it the Securities Act claims should be subject to that. I want to ask you specifically about that because we have our Kolomensky case. Yep. So how do we get around that? So I don't think you need to get around it. My first answer to your question is that I think Kolomensky is distinguishable on its facts from the pleading that was in that case. So in that case, the plaintiffs did not segregate their allegations. They alleged, if you look at the complaint in that case, there's one set of allegations, and at the end there are accounts for the Securities Act claims and the Exchange Act claims together. They didn't make any effort to segregate them. Pleading is formalistic, and the Securities Act has a pleading standard, and the Exchange Act has a different pleading standard. And I think if you look at our complaint, the issue which does not require you to take a difference with the Kolomensky holding is to say, in this case, the plaintiffs disavowed their fraud allegations, pled them separately, have different facts. There are parties in our case under the Securities Act claims that are not parties in the Exchange Act claims. What are the different facts? The different facts. So, Your Honor, the main different fact is that there are different parties and that the allegations of untrue statements in the Securities Act claims do not discuss the defendant's, you know, affairments related to their state of mind or their culpability for scienter. So that's the main difference. I would submit to you, and I have to concede, I think that the subject matter of the statements for the Securities Act claim and the Exchange Act claims are the same. But I think, and I know Judge Klain, his dissent in the Kolomensky case, talks about, you know, not abrogating the importance of the strict scrutiny that's applied under the Securities Act. He quotes the Hudson, the Huddleston case, which says, basically, the Securities Act was put in place to have a strict liability standard, and that's important. And when plaintiffs make this effort to segregate their claims and to not allege fraud on the Securities Act claims, that should be honored. In the majority opinion in Kolomensky, you cite to the Third Circuit's decision in the Suprema case, which I think is telling about the ability to divide these claims up and to preserve the ability to bring claims under the stricter standard of the 33 Act. I see that I'm out of time, but I appreciate your solicitude. Thank you.  Good morning, Your Honors. Counsel, may it please the Court, I'm Gary Feinerman for the defendants' appellees. The district court saw this case for precisely what it was, an effort to turn truthful, mind-run statements and disclosures regarding litigation risk and regulatory compliance into securities laws violations, and then to capitalize on a stock drop that followed the large adverse verdict in the Komuda case. At bottom, this case is about the verdict. It was the watershed event, which is why the class period ends on the date of the verdict and why the first clause of the plaintiff's opening brief is to reassure investors concerned with the avalanche of litigation. And the concern among investors due to the Komuda verdict was not just the verdict itself, but the 800 or so other cases that were waiting behind it in the Willowbrook EO cases that were pending in Cook County. And 363 million times 800 is a very, very big number. Significantly, the stock rebounded after the Fornic verdict two months later. And then two months after that, it completely rebounded, and then some, when the Willowbrook plaintiffs and the company entered into a settlement of all 870 cases, including the Komuda case, for $408 million or less than $500,000 per plaintiff or just over a penny on the dollar from what the Komuda verdict was. And the plaintiffs want to take one moment in time, which is the Komuda verdict, and claim that the defendants were wrong, said wrong things about the litigation the two years before the verdict. The trouble for the plaintiffs' case, and we could see this in their briefs. Their briefs really kind of relegate the litigation statements to second-class status and focus on the regulatory compliance statements, which I'll get to in a moment. The trouble, the reason why they do that is that in the two years or so before the Komuda verdict, the defendants' statements regarding the litigation were neither false nor misleading. You would agree that a litigation risk statement could cross the line in some contexts.  And there are examples of that that both parties cited. You said, we're going to win this, no question. Right. The suit is groundless. It's meritless. It's a nuisance. Things like that. And then, like, a short time later, the company gets hit with a big judgment or enters into a very, very large settlement. The defendants here did nothing of the sort. They disclosed the litigation. They said the company would mount a vigorous defense and argue that the omissions did not cause the EO plaintiff's cancer. But they forthrightly acknowledged that there were risks and that juries could see things the other way. And they further acknowledged that if there were adverse judgments, that could have a material adverse effect on the company. And on top of that, they added that the company's insurance policies might not cover the judgments. And significantly on top of that, the company also acknowledged, and all of this is set forth in the record, and I point the panel in particular to the prospectus, which is docket 31-3 in the district court. The company acknowledged that the regulatory compliance, that complying with regulations would not necessarily spell victory in the litigation, given the common law nature of the claims. There was no permit shield. Just because you comply with the omissions levels in the permit, it doesn't mean that you're going to prevail on a negligence or a strict liability case, because there are different legal regimes that impose different standards. And so the statements about the litigation were correct. They expressed confidence, but also acknowledged the possibility that the juries and the courts could see things the other way. And their opinions, and they were reasonable opinions, and the reasonableness of the opinions were borne out by the Fornic verdict. I want to interrupt, I'm sorry, and ask about the scheme liability claim. If I understand the district court's opinion correctly, the district court identified that fraud was an element of that claim. Is that correct? If it's not correct, what do we do about it? The scheme liability claim? Correct. Yeah, the district court, that was the subject of discussion at the argument. I don't know if it was expressly referenced in the district court's decision, but, you know, the scheme liability is subject to 9B if the scheme is stated under Rule 9B, if the scheme claim proceeds under Rule 10B-5, which it does. So it is a 9B issue, but you don't even, it is the law, but it really, the scheme claim fails for other reasons. For what reasons? Sure. So the scheme claim has to be separate. It could lean on the misstatements, but there also has to be aspects of the scheme that go beyond the misstatements that are the core to the statement claims. And there needs to be scienter, correct? Right, there needs to be scienter, but kind of the aspects of the scheme that the plaintiffs allege here is that the scheme involves skimping on emission controls actions, not words, skimping on emission controls regulatory and permit noncompliance and deceiving the regulators. And we can test all of those things, although the company did acknowledge in its prospectus on a couple of occasions that while compliance was sound, there had been instances in the past where there wasn't compliance, and there might be instances in the future where there wouldn't be compliance. So those were the actions, but those actions took place well in advance of the company going public and selling stock. They went back with respect to the back vent issue, went back into the 2000s with respect to engagement with the EPA on whether or not to identify EO as a potential carcinogen. That was in the 2000s. The actions with respect to the IEPA, the state version of the Equal Protection Agency, those went back into the 1980s. Those are what precedent teaches and what the words of the statute say in connection with the purchaser sale securities. Those stale actions, the actions, the non-statements, the actions that are core to their scheme liability claim are way too remote in time to have been in connection. Counsel, can we adequately address the Scheme Liability Act claims in light of the fact that the district court declined to address the SIENTA requirements? Should the court have delved into SIENTA in relation to the scheme liability claims, or was that necessary? The court, I'm sorry, the SIENTA issue was an alternative ground to dismiss at least. The court said he wasn't going to, well, he didn't address, did not address those. Right. It wasn't necessary for the district court to do so because there was an alternative ground that independently disposed of all the claims. But the alternative ground, and I may be confused, but the alternative ground was that there was a material misrepresentation. Right. But as I understand the elements of a scheme claim, that's not an element. Of the scheme claim, right. So a material misrepresentation is an element of the statement claims. Right. That's right. And the scheme claim, it's not because the scheme has to rest on actions, and the actions that they allege were too remote in time to be in connection with the purchase or sale of a security, which is why the scheme claim fails. The reason why the statement claims fail, Judge Clay, at least as identified by the district court, and that was our principal argument, which is that there were no false or misleading statements, let alone false or misleading statements that were material. And so it was a falsity holding and a materiality holding. And those holdings were correct, so the district court did not have to get into the alternative secondary ground for dismissing the 10B claims, which was Scienter. Scienter, of course, is an element of the 10B claims, but not the Securities Act claims under 11 and 12. How do you respond to your opposing counsel's point on Kolomensky? Right. They say there's different defendants, maybe a different set of facts. Right. I mean, if you look at Kolomensky and Judge Clay, I don't mean to pick at a scab here given the lineup in that case. You know, in terms of Kolomensky, especially if you look at footnote three of Kolomensky, and what footnote three says is that if the 10B claims rest on the same facts as the Section 11 and 12 claims, the Securities Act claims, the Securities Act claims are also subject to Rule 9B. And what the plaintiff did in Kolomensky was it laid out the facts and then off of that one recitation of the facts had a 10B claim and a Section 11 Securities Act claims. And this court held that, you know, when both sets of claims derive from the same set of facts, 9B applies not just to the 10B claims but also the Securities Act claims. The plaintiffs are saying, well, Kolomensky is different. Kolomensky is distinguishable because what we did here is we laid out all the facts and then said this is pertinent to our 10B claims. And then we cut and pasted those facts with some paraphrasing and put it in a different section of the complaint and used those paraphrased cut and pasted facts to be the predicate for the Section 11 and Section 12 claims. The fact that you cut and paste a set of facts and paraphrase it a little doesn't change the fact that they are the same facts, and that's really the essence of Kolomensky. And it doesn't matter if you have different parties or defendants? It doesn't matter. It does not matter. And the reason is because the facts are the same, the statements are the same, the alleged scheme is the same. And as counsel recognized, it all turns on the same facts. It all turns on the same allegations, on the same actions and statements of the company. And it would be the height of formalism to say, well, what happened in Kolomensky? It was one set of facts. But if you cut and paste the same set of facts and paraphrase it a little bit, that makes all the difference in the world. It doesn't make any difference, and that's clear from footnote three of Kolomensky. I'm running a little short on time, so I wanted to address, Judge Ritz, your claim about whether EO, you asked a question about EO causing cancer and whether EO is a carcinogen. And I just wanted to note that the company in its prospectus was very forthright about what the EPA had said in 2016, that EO is a potential carcinogen with respect to certain cancers, and went on to acknowledge that in 2018, the EPA singled out the area around Willowbrook, the area around the California facility, and the area around the New Mexico facility as having elevated instances of cancer. With respect to the statement that the officers made during the earnings call or the investors call, that EO did not cause the cancer of the plaintiffs in the Willowbrook EO cases, that was the company's defense in those cases. And it's all right for a company to say, we have a strong defense, we're going to mount a defense, we're going to do what we can do to prevail on the case, as long as those statements are qualified with, but we could lose. And a jury could see things the other way. And if the jury does see things the other way, and our insurance doesn't cover the judgments, it could have a material adverse impact on the case. And that's what a reasonable investor would have known in 2020 when the stock went public and in 2021 and 2022. And as it turns out, the statements that the officers made about not causing the cancer of the plaintiffs, the first jury didn't see things our way, but the second jury did in Fornix. So not only were those opinions reasonable, they ended up being vindicated. And I'll just note that the plaintiff's lawyers in the Willowbrook EO cases ended up settling, as I mentioned, those cases for just over a penny on the dollar compared to the Commuda verdict. So even they must have recognized that the causation case they had was relatively weak, thereby vindicating the officer's statements. I see I'm out of time. Unless the panel has any further questions, we'd ask that this court affirm the judgment of the district court. Thank you. Any word about it? Thank you, Your Honors. I'd like to start with a sort of fundamental, I think, tension that I talked about at the beginning, and that's that these personal injury cases and the securities cases can exist in parallel. And what investors are trying to do is they're trying to understand, what is the value of this company? And how does their potential liability or exposure in these cases relate to that value? And the defendants made a lot of statements about this. They waded in and they made statements that they didn't have to make. And they talked at length about the historical conduct of their company, because that was going to be the issue in the cases. They wanted to alleviate the concerns of investors that they were going to be exposed to a significant liability. And that's why the facts in our complaint and the facts that are relevant to those statements go back to the 1980s and the 2000s. It's because that's when the people who were the plaintiffs in those injury cases were exposed to the gas that Soterra's facilities were emitting. So they had to address that concern. And they addressed it by saying, historically, we care deeply about the communities that we were around. So it is important. And if you look at the contrast between the statements that they made about their historical compliance and behavior, and what the information that was presented to the jury and reported after the verdict came out, those two things, I don't think, can be squared with one another. Counsel for the defendants made a statement about, talked about the Fornic case, the Fornic trial, that was the second trial, and about the settlement. So we appreciate that once the information that came out in the trial about the historical conduct of the company was into the market, the investors priced that in. The defendants do not make a loss causation argument at the pleading stage. That argument would have been subject to Rule 8. It's a very complicated question. It involves economics and experts, and it's usually reserved for summary judgment or mostly, most often, trial. The arguments that they're making about Fornic and the settlement relate to loss causation. They relate to, how much did the stock drop after the verdict came out? Is that attributable to the result of the jury? Which we admit, the defendants couldn't be predicted. That's not what our case is. We're not saying you failed to predict that you would lose that trial. What you're being tagged with in the securities claims is, what did you say about the evidence that would pertain to those claims? And you didn't tell the truth when you chose to speak on those subjects. And so the question of how much the stock dropped after any one of those things is a question for loss causation that the court below, frankly, should not have considered and drew inferences against the plaintiffs, inverted the pleading standard. We quote cases in our papers about that. I understand your point on that, counsel. I wanted to ask you about the scheme liability. Sure. That's a good question. Am I wrong that the district court identified material misrepresentation as an element of that claim? He didn't address it specifically in the argument he talked about that. In the opinion, I don't believe he addresses that. If he did, would that be an error? The case law on that is a little bit mixed. You can have a scheme claim that involves material misrepresentations. Some of the decisions on that point say that there has to be something else, and the something else that we would allege here is that there was a course of conduct that related back to many years of influencing regulators, of disconnecting back vents, of doing things that were inconsistent with what you would expect investors to believe. And that scheme continued to operate after the IPO because it wasn't correct. I guess that was partly what I was going to ask next, which is we have this 2023 Teamsters decision where we say our court has not identified the scheme liability elements. The Second Circuit has set out this test. We don't really say in that opinion, at least as far as I can tell, that that is our test now. And I'm just curious whether you have a take. I think that a scheme claim does not need material misrepresentations, but it can have material misrepresentations in a circumstance like this. We obviously allege that there were material misrepresentations. That's our 10b-5b claim. The 10b-5a and c claims, the scheme claims, lean on the fact that there was an ongoing, at that point continued to be concealed, set of behaviors that affected the statements related to the subject matter of the scheme. Just on your argument undercut to some extent by the fact that this is not a case where there are a lot of suspicious sales. There were not a lot of sales at suspicious times because even though we can address the scienter since that wasn't ruled on by the district court, nevertheless, and we cannot apply the Helwig factors, but just from an evidentiary standpoint, you're not coming in here saying that there were a lot of transactions that were suspicious at suspicious times and that kind of thing. Your Honor, we allege that the CEO sold $53 million worth of his own shares during the class period, which represented 27% of its holdings. But over what period of time? I don't have the dates in front of me. We could submit that in a letter, but it was, I believe, within the five months following the lockup period for the IPO. Sometime in 2021, I believe, most of those sales occurred. So after the IPO, when the stock was at a much higher price than it was after the class period. The secondary public offering, which was in March of 2021, went out at $27 a share. After the end of the class period, the shares were trading as low as seven. So Mr. Petrus, the CEO of the company, sold $27 million worth of his stock at much, much higher prices than those investors who sold after, or who suffered losses after the end of the class period occurred. I just wanted to read, if I could, and you can tell me not to, but I wanted to read... But you're not alleging that he engaged in insider trading? We are alleging that he knew the facts that were misrepresented in his statements and that he sold those shares at inflated prices. That is what we are alleging. Council quoted from footnote three of the Kolominsky decision, and I just had to respond because what the majority opinion says is that you can have a Securities Act claim that is consistent with the Rule 8 pleading standard if it carefully distinguishes the fraud claims from other claims. We believe that's what we did in our case. And in footnote three, which he noted, it says notably here the plaintiff brought claims that rely on one set of facts which demonstrates a unified course of fraudulent conduct. That is what happened in the Kolominsky case. They didn't make any effort to segregate the allegations out, including against the defendants who only had Securities Act claims. We made painstaking effort to do that here, and it's important to preserve plaintiffs' ability to bring claims consistent with the standard of the 33 Act as distinct from the Exchange Act. I thank you, Your Honors, for hearing me this morning. We respectfully request that the District Court's decision be reversed. Thank you.